**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | | |
|---|---|---|
| AGRI-LABS HOLDING LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 1:15-CV-26-TLS |
| | ) | |
| TAPLOGIC, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

This matter comes before the Court on Motions for Summary Judgment [ECF Nos. 129, 131] filed by Defendant Taplogic, LLC, and a Motion for Summary Judgment [ECF No. 142] filed by Plaintiff Agri-Labs Holding LLC. The Defendant has moved for summary judgment on non-infringement, invalidity, and lack of personal jurisdiction and venue. The Plaintiff has moved for summary judgment on infringement. These Motions are now fully briefed and ripe for review.

## BACKGROUND

On January 22, 2015, the Plaintiff filed its Complaint [ECF No. 1] against the Defendant, alleging that the Defendant infringed the Plaintiff's U.S. Patent No. 8,286,857 ("the '857 Patent") regarding a "Soil Sample Tracking System and Method." The Defendant answered on February 17, 2015 [ECF No. 11], alleging numerous affirmative defenses and counterclaiming for a declaratory judgment that it has not infringed the '857 Patent and that the '857 Patent is invalid.

The '857 Patent involves a method and system directed to soil sampling to determine nutrient levels across various areas in fields. After samples were collected, they could then be tested to determine any nutritional deficiencies. The test results would be transferred to a fertilizer applicator, which would adjust the flow of nutrients according to recorded geographic positions. Previously, a farmer who wanted to evaluate the nutritional needs of soil would collect soil samples from various places and mark the containers into which the samples were placed with individual identifiers to memorialize the precise geographic position from which each sample was collected. Handwritten identifiers and pre-printed labels were two common methods for marking sample containers. However, both of these methods were time-consuming and prone to errors. Technicians could misread handwritten identifiers in a lab. They could also incorrectly enter the information on the pre-printed labels into a computer. The '857 Patent purported to solve these issues.

There are two independent claims at issue. Independent Claim 1 recites:

A method comprising: generating a plurality of soil sample containers each having a unique identifier associated therewith; manually pulling at least one soil sample from a field and placing said at least one soil sample in a respective one of said plurality of soil sample containers; scanning said unique identifier associated with said soil sample container containing said at least one soil sample with a handheld remote terminal, wherein said handheld remote terminal includes a handheld remote terminal sampling application, wherein said handheld remote terminal sampling application is configured to allow a sample taker to enter a farm/client name and a field identifier, and wherein said handheld remote terminal sampling application includes a handheld scanning application configured to allow said sample taker to scan said unique identifier with a scanner on said handheld remote terminal; obtaining a geographic coordinate reading associated with a location in said field from where said soil sample is obtained; and associating said soil sample with said unique identifier and said geographic coordinate reading.

Independent Claim 13 recites:

A system, comprising: a plurality of containers each containing a unique identifier; a handheld remote terminal including a device operable to read said unique identifiers and geographic position sensor, wherein a plurality of soil samples are

manually taken from a field and as each said soil sample is placed in said container said handheld remote terminal includes an application operable to read said unique identifier and associate said unique identifier and thus said container with said soil sample, wherein said handheld remote terminal is operable to automatically use said geographic position sensor to obtain a position reading in said field and further associate said soil sample with said geographic position, wherein said unique identifier and said geographic position are stored in a database; a second application on said handheld remote terminal operable to sync the contents of said database to a lab device, wherein said lab device is operable to read said unique identifier upon receipt of said containers; a test instrument operable to test said soil samples and generate one or more test results as a function of said soil sample, wherein said test results are uploaded to said unique identifier.

The product accused of violating the claimed method and system is called the AgPhD Soil Test application ("the AgPhD App"), developed by the Defendant for use with smartphones. The Plaintiff accuses the Defendant of infringement because when the end-users of the AgPhD App use the smartphone app for its intended purpose, the Plaintiff asserts that both the method and system claims of the '857 Patent are infringed. The Plaintiff argues that the Defendant is liable for this infringement because all of the relevant steps of the method and all of the components of the system are attributable to the Defendant. The Plaintiff asserts that the Defendant is liable both for direct and indirect infringement.

## JURISDICTION AND VENUE

First, the Court will address the Defendant's arguments regarding personal jurisdiction and improper venue. As to jurisdiction, the Plaintiff argues that the Defendant waived its right to challenge personal jurisdiction when it appeared, answered, and asserted counterclaims against the Plaintiff. The Court agrees. "[B]y asking the court for relief, [the Defendant] consented to jurisdiction in the same way a plaintiff consents to jurisdiction by filing an action with a court." *Mallard v. Mallard*, No. 90 C 3335, 1992 WL 47998, at *5 (N.D. Ill. Mar. 4, 1992) (citing *Adam v. Saenger*, 303 U.S. 59 (1938)). "[E]ven when a valid personal jurisdiction defense exists, the

defense is waived if the objecting party . . . proceeds to litigate the case on its merits."
*Blockowicz v. Williams*, 630 F.3d 563, 566 (7th Cir. 2010) (internal citation omitted); *see also*
*Continental Bank, N.A. v. Meyer*, 10 F.3d 1293, 1296–97 (7th Cir. 1993) (finding that despite
raising the defense in its answer, the defendant consented to the court's jurisdiction by failing to
argue the point until summary judgment). In this case, the Defendant affirmatively requested
declaratory relief, litigated this case on the merits for nearly three years, and only now, at
summary judgment, argues the point. Therefore, the Defendant has waived this defense, and the
Court has personal jurisdiction over the Defendant.

Venue in patent actions is governed exclusively by 28 U.S.C. § 1400(b), which provides:
"Any civil action for patent infringement may be brought in the judicial district where the
defendant resides, or where the defendant has committed acts of infringement and has a regular
and established place of business." In *TC Heartland LLC v. Kraft Foods Group Brands LLC*, the
Supreme Court affirmed that the "residence" of a domestic corporation for the purposes of
§ 1400(b) is where the corporation is incorporated. 137 S. Ct. 1514, 1515 (2017). Thus, the
Defendant argues, in this case, venue is improper because the Defendant resides in Kentucky and
has no "regular and established" place of business in Indiana. The Defendant also argues that it
has not waived its right to challenge venue because of this recent change in controlling law.

Resolving a split among the district courts, the Federal Circuit recently held that venue
challenges based on *TC Heartland* were not previously available to defendants under the
meaning of Rule 12(g)(2) and, thus, were not waived under Rule 12(h)(1)(A). *In re Micron*
*Tech., Inc.*, 875 F.3d 1091, 1099–1100 (Fed. Cir. 2017). However, the Federal Circuit also noted
that "Rule 12(h)(1) is not the sole basis on which a district court might, in various circumstances,
rule that a defendant can no longer present a venue defense that might have succeeded on the

merits." *Id.* at 1100. Rather, "Congress has provided express statutory confirmation of judicial authority to consider the timeliness and adequacy of a venue objection." *Id.* Under 28 U.S.C. § 1406(b), "[n]othing in this chapter shall impair the jurisdiction of a district court in any matter involving a party who does not interpose timely and sufficient objection to the venue." Thus, the Federal Circuit found it "clear that, apart from Rule 12(g)(2) and (h)(1)(A), district courts have authority to find forfeiture of a venue objection." *Id.*

However, the Federal Circuit has not "provided a precedential answer to the question of whether the timeliness determination may take account of factors other than the sheer time from when the defense becomes available to when it is asserted, including factors such as how near is the trial, which may implicate efficiency or other interest of the judicial system and of other participants in the case." *Id.* at 1102. Rather, the Federal Circuit explicitly declined to "explore the contours of timeliness outside Rule 12(g)(2) and (h)(1)(A) or how to assess what constitutes consent to venue or what if any other considerations could justify a finding of forfeiture even when the defendant has not waived its objection under Rule 12(g)(2) and (h)(1)(A)." *Id.* The Federal Circuit reiterated that the Federal Rules of Civil Procedure "are not all encompassing" and that there are "standard procedural devices trial courts around the country use every day in service of Rule 1's paramount command: the just, speedy, and inexpensive resolution of disputes." *Id.* at 1100 (quoting *Dietz v. Bouldin, Inc.*, 136 S. Ct. 1885, 1891 (2016)). "[A] district court possesses inherent powers that are 'governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases'" *Id.* (quoting *Link v. Wabash R. Co.*, 370 U.S. 626, 630–31 (1962)). However, the Court's "exercise of an inherent power must be a 'reasonable response to

the problems and needs' confronting the court's fair administration of justice." *Id.* (quoting *Degen v. United States*, 517 U.S. 820, 823–24 (1996)).

Per *In re Micron*, the Defendant has not waived its objection to venue based on Rules 12(g)(2) and (h)(1)(A). Nevertheless, the Court finds that the Defendant's objection is not timely given the circumstances of the case. The district courts that have had the opportunity to consider whether to deny a motion to dismiss for improper venue on grounds other than under Rules 12(g)(2) and (h)(1)(A) have taken into account impending trial dates, *see Treehouse Avatar LLC v. Valve Corp.*, No. 15-427, 2017 WL 5564153, at *3 (D. Del. Nov. 20, 2017) (granting motion where trial date not set until 2019), and other considerations such as the defendant's litigation conduct post *TC Heartland*, judicial resources already expended, and prejudice to the plaintiff in "reopening a dormant venue dispute," *see Intellectual Ventures II LLC v. FedEx Corp.*, NO. 2:16-CV-980, 2017 WL 5630023, at *3 (E.D. Tex. Nov. 22, 2017) (denying motion where the Defendant waited more than two months after *TC Heartland* was decided to seek dismissal and had "continued actively litigating this case").

In the instant case, the Defendant admittedly raised its objection to venue only a month after the Supreme Court's decision in *TC Heartland*. However, granting the Defendant's motion at this late stage in the case would not promote the just, speedy, and inexpensive resolution of the dispute. This case has been pending for nearly three years. The Defendant's venue objection was filed concurrently with its Motions for Summary Judgment,[1] and significant judicial resources

---

[1] The Defendant's Motions were filed over four months before the dispositive motion deadline and as part of its Summary Judgment Motions, not as a separate motion as required by the local rules. *See* N.D. Ind. L.R. 7-1(a). The Court finds this continued, active litigation relevant to the Court's determination that the Defendant's Motion is not timely.

have already been expended. Thus, the Court finds that under the circumstances of this case, and Rules 12(g)(2) and (h)(1)(A) notwithstanding, the Defendant's motion is not timely.

Accordingly, the Court will not dismiss this action based on a lack of personal jurisdiction or improper venue.

## STANDARD OF REVIEW

Summary judgment is proper where the evidence of record shows that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The moving party bears the initial burden of informing the Court of the basis for its motion and identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. The burden then shifts to the non-movant to "go beyond the pleadings" to cite evidence of a genuine factual dispute that precludes summary judgment. *Id.* at 324. "[A] court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Heochst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). If the non-movant does not come forward with evidence that would reasonably permit the finder of fact to find in its favor on a material issue, then the Court must enter summary judgment against it. *Id.*

## ANALYSIS

### A.      Whether the '857 Patent is Directed to a Patent-Ineligible Concept

The Defendant argues that the '857 Patent is directed to an abstract idea, which is ineligible for patent protection under 35 U.S.C. § 101. Whether a patent is invalid under § 101 is

a question of law. *CyberSource Corp. v. Retail Decision, Inc.*, 654 F.3d 1366, 1369 (Fed. Cir. 2011); *In re Bilski*, 545 F.3d 943, 951 (Fed. Cir. 2008) (en banc).

In evaluating whether a patent is directed to ineligible subject matter under § 101, the Court "must distinguish patents that claim the building blocks of human ingenuity, which are ineligible for patent protection, from those that integrate the building blocks into something more thereby transforming them into a patent-eligible invention." *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2350 (2014) (internal quotation marks omitted) (citing *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1297 (2012)). This requires a two-step analysis. The Court must (1) "determine whether the claims at issue are directed to a patent-ineligible concept"; and (2) ask "whether the claim's elements, considered both individually and as an ordered combination, transform the nature of the claim into a patent-eligible application." *Id.* at 2357 (internal citations omitted).

"[A]n invention is not rendered ineligible for patent simply because it involves an abstract concept." *Id.* at 2347. Rather, "all inventions . . . embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas." *Id.* at 2354 (quoting *Mayo Collaborative Servs.*, 132 S. Ct. at 1293). Thus, application of abstract concepts "to a new and useful end" are still patent eligible. *Alice*, 134 S. Ct. at 2354 (quoting *Gottschalk v. Benson*, 409 U.S. 63, 67 (1973)). However, "'[s]imply appending conventional steps, specified at a high level of generality,' to a method already 'well known in the art' is not 'enough' to supply the 'inventive concept' needed to make this transformation." *Id.* at 2350 (quoting *Mayo Collaborative Servs.*, 132 S. Ct. at 1294).

The Defendant argues that "soil sampling was well-known to be a way of assigning a unique identifier to a soil sample, keeping a record of the unique identifier, assigning a location

to the unique identifier, adding additional information to the unique identifier like a farm or field name, sending it to a lab, and receiving results as a function of the unique identifier." (Def. Br. 5–5, ECF No. 26.) The Court agrees with the Defendant that soil sampling for the purpose of evaluating the nutritional deficiencies in a field is an abstract idea. However, the Court does not agree that a method for performing soil sampling is necessarily abstract.

Claims directed to a "new and useful technique" for performing a particular task are not directed to an abstract idea. *See Diamond v. Diehr*, 450 U.S. 175 (1981) (method for calculating optimal cure time for rubber); *Thales Visionix Inc. v. United States*, 850 F.3d 1343 (Fed. Cir. 2017) ("new and useful techniques for using sensors to more efficiently track an object on a moving Platform"); *Rapid Litig. Mgmt. Ltd. v. Ce!zDirect, Inc.*, 827 F.3d 1042 (Fed. Cir. 2016) ("new and useful laboratory technique for preserving hepatocytes"). That is, technological inventions that improve upon existing processes to come to the same result more efficiently or more accurately are patent-eligible subject matter. *See Diehr*, 450 U.S. at 184 n.7. In *Alice*, the Supreme Court reiterated that the computer-implemented process for curing rubber in *Diehr* was patent eligible, not because it merely "involved a computer," but rather because "it improved an existing technological process." *Alice*, 134 S. Ct. at 2358 (noting that, even though the invention in *Diehr* made use of a well-known mathematical equation, the invention accomplished something "the industry had not been able to obtain"). In *DDR Holdings, LLC v. Hotels.com, L.P.*, the Federal Circuit found that the claimed system "amount[ed] to an inventive concept for resolving [a] particular Internet-centric problem." 773 F.3d 1245, 1258–59 (Fed. Cir. 2014). Similarly, in *Bascom Global Internet Services, Inc. v. AT&T Mobility LLC*, the Federal Circuit noted that the invention at issue was "a technical way to satisfy an existing problem[,] . . . . a technology-based solution (not an abstract-idea-based solution implemented with generic

technical components in a conventional way) to [achieve the desired result] that overcomes existing problems with other [methods of achieving the desired result]." 827 F.3d 1341, 1351 (Fed. Cir. 2016).

The '857 Patent is directed to a specific technique regarding soil sampling. It is the technique that the '857 Patent claims, not the overall concept of soil sampling to evaluate the nutritional needs of a field. The '857 Patent purports to solve issues associated with existing techniques by coming to the end result more efficiently and accurately. Therefore, the Court does not find that the '857 Patent is directed to an abstract idea that is ineligible for patent protection.

But, even if the Court were to find that the '857 Patent was directed to an abstract idea, the Court would still have to proceed to the second step in the analysis, which is to determine whether there is an "inventive concept."

The cases to which the Defendant cites to support its argument that the '857 Patent is directed to an abstract concept with no inventive step are distinguishable. For example, in *FairWarning IP, LLC v. Latric Systems, Inc.*, the Federal Circuit found the subject matter to be abstract because it "merely present[ed] the results of abstract processes of collecting and analyzing information, without more (such as identifying a particular tool for presentation." 839 F.3d 1089, 1093 (Fed. Cir. 2016) (internal quotations omitted). In *Electric Power Group, LLC v. Alstom S.A.*, the Federal Circuit found the subject matter of the invention at issue to be abstract where the claimed "advance" was "a process of gathering and analyzing information of a specified content, then displaying the results" rather than "any particular assertedly inventive technology for performing those functions." 830 F.3d 1350, 1354 (Fed. Cir. 2016). The Federal Circuit noted with approval the district court's invocation of "an important common-sense distinction between ends sought and particular means of achieving them, between desired results

(functions) and particular ways of achieving (performing) them." *Id.* at 1356. That is because "there is a critical difference between patenting a particular concrete solution to a problem and attempting to patent the abstract idea of a solution to the problem in general." *Id.* In *Secured Mail Solutions LLC v. Universal Wilde, Inc.*, the Federal Circuit invalidated a patent as abstract because the patents were "not directed to specific details of the barcode or the equipment for generating and processing it" and was "not limited to any particular technology of generating, printing, or scanning a barcode, or sending a mail object, or of sending the recipient-specific information over a network." 873 F.3d 905, 910–11 (Fed. Cir. 2017). The Federal Circuit, and the district court below, took issue with the fact that the patent failed to "cit[e] a specific way to solve a specific problem . . . ." *Id.* at 912. The '857 Patent, however, provides a specific way to solve a specific problem. The '857 Patent does not claim the ends sought, but rather claims the means of achieving those ends.

Prior to the invention claimed in the '857 Patent, several different techniques existed, and still exist today, for soil sampling. One such technique involves the use of a computer to guide the human sampler to a location in a field where, upon arrival, a sample would be obtained and placed into a container. The sampler would then handwrite information on the container to identify the container, such as a farm name, a field name, and a method of identification, like a number. This method was time consuming and prone to errors caused by mislabeling or misreading the information. Another technique involved pre-printing labels. In this technique, a sampler would place a pre-printed label onto a container after obtaining the sample. This technique was also time consuming and also vulnerable to errors such as misplacing labels. Both techniques were also vulnerable to errors in the laboratory; the identifiers could be misread or incorrectly entered into a computer. Others sought to solve these problem with complex

machinery that was expensive to purchase and to fix. The invention embodied in the '857 Patent improves the technological process of soil sampling and the manner in which soil sample containers are tracked and associated with the geographic location in the field from where the samples are obtained. The method and system claimed in the '857 Patent therefore accomplish something the industry had not previously been able to accomplish and resolve a particular problem related to the collection of soil samples.

The Defendant also argues that the Plaintiff has done no more than add a generic computer to a method conventionally known in the art. In *Multimedia Plus, Inc. v. Playerlync, LLC*, the court noted that "[f]or a computer to 'impose a meaningful limit on the scope of a claim, it must play a significant part in permitting the claimed method to be performed, rather than function solely as an obvious mechanism for permitting a solution to be achieved more quickly, i.e., through the utilization of a computer for performing calculations.'" 198 F. Supp. 3d 264, 271 (S.D.N.Y. 2016) (finding that "the patent [did] not disclose any specialized programming or other specific technology for accomplishing [the claimed] functions") (quoting *SiRF Tech., Inc. v. Int'l Trade Comm'n*, 601 F.3d 1319, 1333 (Fed. Cir. 2010)). In *Burnett v. Panasonic Corp. of N.A.*, the court found that, where the computer in the patent was "used only to complete the process of converting alphanumeric into natural numbers," it was "'merely as a tool' in the conversion process." No. PX 17-00236, 2017 WL 4947013, at *6 (D. Md. Nov. 1, 2017). For the use of a computer to "salvage an otherwise patent-ineligible process, [it] must be integral to the claimed invention, facilitating the process in a way that a person making calculations or computations could not." *Bancorp Servs. L.L.C. v. Sun Life Assur. Co.*, 687 F.3d 1266, 1278 (Fed. Cir. 2012). The '857 Patent does just that. The application on the smartphone is integral to the claimed invention, and it permits the user to accomplish the process of soil

sampling in a way that a person making calculations or computations could not. *See SiRF Tech.*, 601 F.3d at 1332–33 (finding that "the presence of the GPS receiver in the claims places a meaningful limit on the scope of the claims" because "the use of [the] GPS receiver [was] essential to the operation of the claimed methods"). The '857 Patent does not just employ computer technology to achieve a normal function more quickly, such as performing a calculation. The '857 Patent instead puts specific limitations on what the smartphone must be able to do, such as "scanning" a unique identifier, which is not an action "equivalent to those one could take in the physical world." *Multimedia Plus*, 198 F. Supp. 3d at 270.

The '857 Patent also, contrary to the Defendant's argument, is not simply a method of classifying and organizing data that other courts have held to be abstract. *See, e.g.*, *SkillSurvey, Inc. v. Checkster* LLC, 178 F. Supp. 3d 247 (E.D. Pa. 2016). The method and system claimed in the '857 Patent is an improved technique that prevents errors associated with previous methods of recording and using data. The simplicity and precision of the claimed method and system is something the industry had not been able to obtain. Thus, the Court finds that the '857 Patent introduces an "inventive step" and, as a matter of law, is not invalid under 35 U.S.C. § 101.

**B.      Whether the '857 Patent is Obvious**

The Defendant also argues that the '857 Patent is invalid for obviousness. Patents are entitled to a presumption of validity, and the party seeking to invalidate the patent must present clear and convincing evidence to the contrary. 35 U.S.C. § 282; *Microsoft Corp v. i4i Ltd. P'ship*, 564 U.S. 91, 95 (2011). Under 35 U.S.C. § 103, a patent is invalid if "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having

ordinary skill in the art to which said subject matter pertains." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). This question lends itself to factual inquiries: "the scope and content of the prior art"; "the differences between the prior art and the claims at issue"; "and the level of ordinary skill in the pertinent art." *Graham v. John Deer Co. of Kan. City*, 383 U.S. 1, 17 (1966). It is "[a]gainst this background [that] the obviousness or nonobviousness of the subject matter is determined." *Id.* The Court may also consider secondary considerations such as "commercial success, long felt but unsolved needs, failure of others, etc." *Id.* In making a determination about obviousness, courts may not "reach a conclusion of obviousness before considering all relevant evidence, including evidence of objective considerations." *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*, 676 F.3d 1063, 1077 (Fed. Cir. 2012). This is because "objective considerations, when considered with the balance of the obviousness evidence in the record, guard as a check against hindsight bias." *Id.* at 1079. "[T]emptation to read into the prior art the teachings of the invention in issue . . . is precisely why fact finders must withhold judgment on an obviousness challenge until it considers all relevant evidence, including that relating to the objective considerations." *Id.*

A party seeking to invalidate a patent on obviousness grounds must "demonstrate by clear and convincing evidence that a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success in doing so." *Procter & Gamble Co. v. Teva Pharm. USA, Inc.*, 566 F.3d 989, 994 (Fed. Cir. 2009). "Often it will be necessary for a court to look to interrelated teachings of multiple patents; the effects of demands known to the design community or present in the marketplace; and the background knowledge possessed by a person having ordinary skill in the art, all in order to determine whether there was an apparent reason to

combine the known elements in the fashion claimed by the patent at issue. To facilitate review, this analysis should be made explicit." *Id.* at 418 (citing *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006) ("[R]ejections on obviousness grounds cannot be sustained by mere conclusory statements; instead, there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness.")).

The Defendant's argument that the '857 Patent is invalid is almost exclusively contained within a declaration[2] by Chris Tanner submitted with its supporting brief.[3] However, the declaration is conclusory and does not meet the Defendant's burden to demonstrate invalidity by clear and convincing evidence. The declaration was authored by a patent attorney and constitutes no more than attorney argument. Moreover, an expert's opinion that is conclusory and factually unsupported is not sufficient. *See ActiveVideo Networks, Inc. v. Verizon Comm'ns, Inc.*, 694 F.3d 1312, 1327 (Fed. Cir. 2012).

The Defendant has presented little to no evidence regarding the scope and content of the prior art or the level of ordinary skill in the art. *See Motorola Mobility, LLC v. Int'l Trade Comm'n*, 224 F. Supp. 3d 851, 866 (Fed. Cir. 2013) (finding fault where party "did not clearly

---

[2] The Court notes that, although this submission is characterized as an affidavit, it is rife with conclusory allegations, legal argument (including interpretation of case law), speculation and statements not made based on personal knowledge and would therefore likely be inadmissible as an affidavit. Under Rule 56(c)(4), any affidavit or declaration "used to support or oppose a motion [for summary judgment] must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." On a motion for summary judgment, a court must disregard parts of an affidavit that fail to comply with this rule. *Cooper-Schut v. Visteon Auto. Sys.*, 361 F.3d 421, 429 (7th Cir. 2004); *Friedel v. City of Madison*, 832 F.2d 965, 970 (7th Cir. 1987). The following statements do not comply with the rule and should be disregarded: "(1) conclusory allegations lacking supporting evidence; (2) legal argument; (3) self-serving statements without factual support in the record; (4) inferences or opinions not grounded in observation or other first-hand experience; and (5) mere speculation or conjecture." *Heltzel v. Dutchmen Mfg., Inc.*, No. 3:06-CV-227, 2007 WL 4556735, at *4 (N.D. Ind. Dec. 20, 2007) (quotation marks and citations omitted). The substance of the instant submission is more characteristic of an expert report, and for the purposes of this summary judgment analysis, the Court will construe it as such.

[3] The Court notes that the declaration also asserts that the '857 Patent is invalid under 35 U.S.C. § 102 as anticipated and under § 112 as indefinite. However, the Defendant does not argue these theories in its brief, and the Court will not consider them.

identify the scope and content of the prior art that it was asserting"); *Stryker Spine v. Biedermann Motech GmbH*, 684 F. Supp. 2d 68, 98 (D.D.C. 2010) (finding fault where expert declaration "did not explain what the level of ordinary skill in the art was"). The declaration does not reference the level of ordinary skill in the art, much less establish that the author is a person of ordinary skill in the art. Without information regarding the level of ordinary skill in the art, "a district court cannot properly assess obviousness because the critical question is whether a claimed invention would have been obvious at the time it was made to one with ordinary skill in the art." *Custom Accessories, Inc. v. Jeffrey-Allan Indus.*, 807 F.2d 955, 962 (Fed. Cir. 1986). Where a defendant has "failed to identify the level of ordinary skill in the art used to determine obviousness or demonstrate that such level of ordinary skill is not in dispute," the defendant's argument "fails at the starting gate." *Advanced Media Networks LLC v. Row 44, Inc.*, No. CV 12-11018, 2014 WL 5623951, at *6 (C.D. Cal. Nov. 4, 2014).

Moreover, the declaration does not adequately identify pertinent prior art for the Court's review. The declaration provides a chart purporting to compare common elements between the '857 Patent and other references, vaguely referring to references by the last name of the inventor and the three terminal digits of the patent numbers. Nowhere in the declaration is there further clarification as to what these references are, nor were they provided to the Court as part of the summary judgment record. The declaration also vaguely states that "[o]ther valid Prior Art references for supporting the invalidity of the Covely '857 claims also exist, and are already of record with this court" without pointing to *where* in the record they may be found. (Def. Br. Ex. 4 8, ECF No. 129-4.) It is not obvious to the Court where in the record theses references exist, and the Court is under no obligation to "scour the party's various submissions to piece together appropriate arguments." *Little v. Cox's Supermarkets*, 71 F.3d 637, 641 (7th Cir. 1995).

Aside from not adequately identifying the prior art references to which it refers, the declaration does not cite any specific reason to combine any prior art references.[4] An expert that has "failed to explain how specific references could be combined, which combination(s) of elements in specific references would yield a predictable result, or how any specific combination would operate or read on the asserted claims" is insufficient. *Id.* Not only must the testimony "bear[] [a] relation to [a] specific combination of prior art elements," it must also "explain why a person of ordinary skill in the art would have combined elements from specific reference *in the way the claimed invention does*." *Id.* (citing *KSR*, 550 U.S. at 418). "[I]t can be important to identify a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does." *KSR*, 550 U.S. at 401. This is so because inventions in most, if not all, instances "rely upon building blocks long since uncovered, and claimed discoveries almost necessarily will be combinations of what, in some sense, is already known." *Id.*

The declaration states that "motivation to combine these various references would exist due to almost all of them being in the area of agriculture and farming" and that "[b]ecause there are so many valid references and so many different ways of combining them, any of which would invalidate claim 1, a separate motivation statement for each combination will not be set forth herein." (Def. Br. Ex. 4 at 8.) The declaration goes on to state that "motivation to combine

---

[4] The report also cites to an amendment to the '857 Patent during its prosecution made to overcome a prior art reference. The report concludes: "While the Examiner found this amendment acceptable, it is not unreasonable to suggest these amendments would have been obvious to one of ordinary skill in the art." However, whether a conclusion is "not unreasonable" is not the question on summary judgment. On summary judgment, it is the Defendant's burden to prove that no reasonable juror could come to any other conclusion. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Moreover, in this case, the Defendant's burden is to show obviousness by clear and convincing evidence, not by a preponderance of the evidence. *See Proctor & Gamble*, 556 F.3d at 994.

[one prior art reference] with other references is unlikely to be in dispute, as [the prior art reference] is in the field of soil samples, the exact same field as Covely '857 . . . ." (*Id.* at 14.) But, the Federal Circuit has rejected this line of reasoning to show motivation to combine prior art references. *See, e.g.*, *Securus Techs., Inc. v. Global Tel*Link Corp.*, 701 F. App'x 971, 977 (Fed. Cir. 2017) (affirming finding that "broad characterization" of the prior art "as both falling within the same field . . . without more, is not enough for [the appellant] to meet its burden of presenting a sufficient rationale to support an obviousness conclusion"); *Microsoft Corp. v. Enfish, LLC*, 662 F. App'x 981, 990 (Fed. Cir. 2016) (affirming finding that where the appellant "gave no reason for the motivation of a person of ordinary skill to combine [the two references] except that the references were directed to the same art or same techniques," the petitioner "did not articulate a sufficient motivation to combine"). "Such short-cut logic would lead to the conclusion that any and all combinations of elements known in [the] field would automatically be obvious, without the need for any further analysis."[5] *Securus Techs.*, 701 F. App'x at 977.

In its Reply brief, the Defendant for the first time submits prior art for the Court's review into the summary judgment record. The Defendant points to U.S. Patent No. 6,947,866 ("the '866 Patent"), which claims an "Apparatus and Method For Handheld Sampling," and argues that the specification of the '866 Patent states that the apparatus could be used with a smartphone, providing the necessary motivation. Specifically, the '866 Patent states: "In another embodiment (not shown), the latest generation of hybrid cell phones may be used in place of [personal data assistant] 30 and camera 20, as hybrid cell phones now include a built-in camera, web browser, and full-fledged [personal data assistant] capabilities." '866 Patent, col. 5:9–12. The Defendant then argues in a conclusory fashion that "all of the steps in claim 1 and most of

---

[5] This would be far from the "explicit" analysis required by the Federal Circuit. *See Proctor & Gamble*, 566 F.3d at 994 (citing *In re Kahn*, 441 F.3d at 988)).

Claim 13" of the '857 Patent are present in the '866 Patent, notes that the '866 Patent is in the same field as the '857 Patent, and reiterates that "almost any patents mentioned have a motivation to combine as noted in" the Tanner declaration. (*See* Def. Rep. Br. 10, ECF No. 150.) But, as discussed above, this is insufficient to meet the Defendant's burden of proof to show invalidity by clear and convincing evidence.

Finally, the Court notes that the Defendant has failed even to mention objective considerations of nonobviousness. The Defendant attempts to justify this omission, arguing that the Plaintiff "did not use them in their patent application and has no expert to discuss them so it is not necessary for [the Defendant] to do so." The Court disagrees with this assertion. First, it is unclear why a patentee would be required to "use" secondary considerations in its patent application. This is especially so with commercial success, a consideration explicitly laid out by the Supreme Court in *Graham*, which would likely be unknown at the time of patent. Moreover, the Federal Circuit has made clear that there is no "burden-shifting framework" by which the Plaintiff must prove secondary considerations once the Defendant has made a prima facie showing of obviousness based only on the prior art. *In re Cylobenzaprine*, 676 F.3d at 1079 (reversing where "it [was] clear that the district court assumed that it was [the plaintiff's] burden to disprove the court's initial obviousness finding"). Thus, the absence of an expert to explain these considerations is not fatal to the Court's consideration of them. In fact, Federal Circuit precedent does not support an argument that expert testimony is required to show objective considerations. *See id.* (finding district court was "wrong to ignore the non-expert evidence proffered on this point"). Without evaluating its weight, the Court notes that there is evidence of record as least as to the commercial success of the AgPhD App. The Plaintiff's failure to address

any objective indicia of non-obviousness in response to the Defendant's arguments does not aid the Defendant in meeting its burden to show obviousness by clear and convincing evidence.

Therefore, the Court will deny the Defendant's Motion for Summary Judgment on Invalidity.

**C.     Whether the Accused Product Infringes the '857 Patent**

Patent infringement analysis involves two steps. First, the Court must determine the scope and meaning of the claims of the patent. *See Markman v. Westview Instrument, Inc.*, 517 U.S. 370, 388–89 (1996). The Court previously made this determination in its Markman Order [ECF No. 144]. Second, the patent claims as construed by the Court must be compared to the accused device or method to determine if infringement exists. *See Warner-Jenkinson Co.. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 29 (1997).

Both parties have moved on the issue of whether the accused AgPhD App infringes the '857 Patent when used for its intended purpose. The Defendant first argues that it is the wrong party to the lawsuit because it does not own the AgPhD App. In support, the Defendant states that another company offers the AgPhD App on the App Store and Google Play, that the Defendant has never offered the AgPhD App on the App Store and Google Play, and that the Defendant does not own or control the website agphdsoiltest.com. However, the Defendant admits that it developed the accused product, and the Plaintiff has produced other evidence from which a reasonable juror could conclude that the Defendant is or was responsible for the sale and maintenance of the accused product. Based on these facts, a jury could find liability for direct or indirect infringement.

Aside from its argument that it does not own or control the AgPhD App, the Defendant argues that it does not directly infringe the '857 Patent because (1) the AgPhD App does not meet all the limitations of any of the Claims, and (2) no single entity performs all of the steps in the claimed method. The Defendant argues that it does not indirectly infringe because the Plaintiff has come forward with no evidence of instances of direct infringement and because the AgPhD App has substantial noninfringing uses.

## 1.    *Direct Infringement*

"Except as otherwise provided in this title, whoever without authority makes, uses, offers to sell, or sells any patented invention . . . during the term of the patent therefor, infringes the patent." 35 U.S.C. § 271(a). Because § 271(a) is worded disjunctively, a party infringes a patent if it makes or develops an infringing product even if it never uses or sells that product. An accused product or process can infringe a patent either literally or through the "doctrine of equivalents." *Microsoft Corp. v. GeoTag, Inc.*, 817 F.3d 1305, 1313 (Fed. Cir. 2016). "To establish literal infringement, every limitation set forth in a claim must be found in an accused product, exactly." *Id.* (quoting *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1575 (Fed. Cir. 1995)). In this case, to prove direct infringement under § 271(a), the Plaintiff must demonstrate that the Defendant performed or used each and every step or element of the claimed method. *Warner-Jenkinson*, 520 U.S. at 29.

The doctrine of equivalents is available to a party when it cannot prove that every limitation of the disputed claim is literally met. Under the doctrine of equivalents, "a product or process that does not literally infringe upon the express terms of a patent claim may nonetheless be found to infringe if there is 'equivalence' between the elements of the accused product or

process and the claimed elements of the patented invention." *Id.* 21. "The doctrine of equivalents prevents an accused infringer from avoiding infringement by changing only minor or insubstantial details of a claimed invention while retaining their essential functionality." *Sage Prods., Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1424 (Fed. Cir. 1997). The doctrine of equivalents will apply where the accused product and the claimed product "do the same work in substantially the same way, and accomplish substantially the same result." *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 608 (1950) (internal quotations omitted).

For a method claim, "[d]irect infringement under § 271(a) occurs where all steps of a claimed method are performed by or attributable to a single entity." *Akamai Techs., Inc. v. Limelight Networks, Inc.*, 797 F.3d 1020, 1022 (Fed. Cir. 2015). The Court must first determine whether, as to the method claims, there is a genuine issue of material fact that all of the steps of the claimed method are, in fact, performed and, whether as to the system claims, there is a genuine issue of material fact that all of the components of the claimed system are present when the end-user of the AgPhD App uses the app for its intended purpose. The Court must then determine whether the performance of each step or the use of each component can be attributed to the same entity.

*a. Method Claims*

1. Independent Claim 1

Independent Claim 1 consists of eight steps, all of which the Plaintiff has the burden to demonstrate are performed during the use of the AgPhD App. The first step requires "generating a plurality of soil sample containers each having a unique identifier associated therewith." In its Markman Order, the Court construed the term "generate" to mean "deliver or produce." The

Court construed the term "unique identifier" to mean "a machine readable representation of data, which may but need not consist of a bar code, relating to the object to which it is attached." At some point, users of the AgPhD App could order soil sample bags, containing QR codes from Midwest Laboratories through the agphdsoiltest.com website. The Defendant argues that this limitation is not met because there is no evidence that a QR code is a "unique identifier." However, the instructions provided with the AgPhD Soil Test App instruct the end-user to "[s]can the QR code on the bag . . . to identify the sample location." From this a reasonable trier of fact could conclude that the QR code is a representation of data that is machine readable that relates to the object to which it is attached. *See Tinnus Enter., LLC v. Telebrands Corp.*, 846 F.3d 1190, 1204 (Fed. Cir. 2017) ("Indeed, this court has previously approved of the use of instruction manuals to demonstrate direct infringement by customers . . . . We are aware of no case law prohibiting a court from relying on product instructions to find direct infringement").

The second step requires "manually pulling at least one soil sample from a field and placing said at least one soil sample in a respective one of said plurality of soil sample containers." There are multiple ways to pull a soil sample, both manual and mechanical. A reasonable trier of fact could find that the instructions provided with the AgPhD Soil Test App instruct the end-user to manually pull soil samples.

The third step consists of "scanning said unique identifier associated with said soil sample container containing said at least one soil sample with a handheld remote terminal." In its Markman Order, the Court construed "handheld remote terminal" to mean a "smartphone." The Court construed the term "scan" to mean "to convert into digital form for processing" and "scanner" to mean "a device that converts information into digital form for processing." The Defendant argues that the AgPhD App merely takes images and that taking an image with a

smartphone is not "scanning" under the Court's definition. But, a reasonable trier of fact could determine that the purpose of "taking a photo" of the QR code is to identify the sample and that using a digital image for identification necessary requires the QR code to be "convert[ed] into digital form for processing." Even if this claim limitation is not met literally, a reasonable trier of fact could find that it is met under the doctrine of equivalents.

The fourth step requires that the "handheld remote terminal includes a handheld remote terminal sampling application." The AgPhD App is an application that is downloaded and installed onto smartphones for the purpose of aiding in soil sampling.

The fifth step requires that the "handheld remote terminal sampling application is configured to allow a sample taker to enter a farm/client name and a field identifier." The Defendant argues that the AgPhD App does not meet this limitation because the end-user can also enter the client/farm name on a tablet or a personal computer and choose to enter it via the website rather than the app. But, the '857 Patent does not require that the end-user's only option to enter the farm/client name and a field identifier be via a smartphone. *See, e.g.*, *Vulcan Eng'g Co. v. Fata Aluminium, Inc.*, 278 F.3d 1366, 1375 (Fed. Cir. 2002) ("It is irrelevant whether an element has capabilities in addition to that stated in the claim."); *N. Telecom, Inc. v. Datapoint Corp.*, 908 F.2d 931, 945 (Fed. Cir. 1990) (finding that a party cannot avoid infringement where "a claimed feature performs not only as shown in the patent, but also performs an additional function"); *iRadio Steel & Mfg. Co. v. MTD Prods., Inc*., 731 F.2d 840, 848 (Fed. Cir. 1984) ("[A]n accused device cannot escape infringement by merely adding features, if it otherwise has adopted the basic features of the patent.") (internal quotations omitted). The Federal Circuit "ha[s] never required that a claim read on the entirety of an accused device in order to infringe." *SunTiger, Inc. v. Sci. Research Funding Grp.*, 189 F.3d 1327, 1336 (Fed. Cir. 1999).

The sixth step requires that the "handheld remote terminal sampling application includes a handheld scanning application configured to allow said sample taker to scan said unique identifier with a scanner on said handheld remote terminal." In its Markman Order, the Court defined "application" as "a piece of software that performs one or more functions." The Defendant argues that the AgPhD App does not meet this limitation because it is only one piece of software, and there is no separate scanner. The Defendant also argues that the QR code is not a unique identifier but that the QR code is used only to generate the unique identifier within the AgPhD App. As the Court noted above, a reasonable trier of fact could find that taking an image of a QR code in order to generate a number falls under the Court's definition of scanning, i.e., "to convert into digital form for processing."

The Defendant's assertion that the claims require a separate piece of software for the scanning function is unpersuasive. "It is settled law, and it is good sense, that one does not escape infringement by combining into one element what a claim specifies as two, provided that the single element performs the function of both in the same way." *Gibbs v. Triumph Trap Co.*, 26 F.2d 312, 314 (2d Cir. 1928). Given the Court's construction of "application" to mean "a piece of software that performs one or more functions," a reasonable trier of fact could find that a single application can perform both steps required by Claim 1 and, therefore, that this limitation is met.

The seventh step requires "obtaining a geographic coordinate reading associated with a location in said field from where said soil sample is obtained." The Defendant argues that the AgPhD App does not meet this limitation because the end-user can obtain a geographic reading from anywhere, not just a location in a field, such as a golf course or a yard. But, again, nothing

in the '857 Patent requires that the application permit geographic readings *only* in a field, and extra capabilities do not automatically make the app non-infringing.

The final step is "associating said soil sample with said unique identifier and said geographic coordinate reading." Although the Defendant insists the app does not have to, it admits that the AgPhD App can associate a unique identifier with a geographic coordinate reading.

Accordingly, there remain genuine issues of material fact as to whether, in the course of using the AgPhD App for its intended purpose, all of the steps of the method of Claim 1 are performed.

2.      Dependent Claims 2–5

Dependent Claim 2 adds the limitation: "wherein said unique identifier comprises a barcode." At least at some point, the soil sampling bags delivered by Midwest Laboratories contained QR codes, and the Plaintiff claims that it is a well-known fact that QR codes are a type of bar code. The Defendant argues that the only evidence that the Plaintiff has offered to satisfy its burden of proof is a Wikipedia article, which is not typically admissible evidence. The Defendant also argues that the Plaintiff cannot meet its burden of proof on this Claim without expert testimony, which it does not have. The Court agrees. QR codes and their relationship to bar codes is not something that is within the common and ordinary experience of a lay juror. The Plaintiff has disclosed no experts in this case and has proffered no other admissible evidence. Without expert testimony, the Plaintiff cannot meet its burden of proof at trial to show that the bags delivered by Midwest Laboratories for use with the AgPhD App meet this limitation.

Claim 3 requires: "The method of claim 1, further comprising storing said unique identifier and said geographic coordinate reading in a database associated with said handheld remote terminal." The Defendant argues that the Plaintiff needs expert testimony to establish this limitation, which it does not have. The Court agrees. Although "database" as used in the '857 Patent may be commonly understood by a person of ordinary skill in the art, it is not commonly understood by a lay juror. The Plaintiff argues that there must be a database associated with the smartphone because Claim 4, which depends from Claim 3, requires syncing said database with a server, and the Defendant admits that the AgPhD App syncs data located on the App itself to a server and that once the data is transferred to the server, it is stored on a database. However, the deposition testimony on which the Plaintiff relies for this admission indicates only that information is stored in a database associated with a *server*, not with the *handheld remote terminal* as claimed. Moreover, the Court does not find that "syncing" is a term commonly understood by a lay juror. Thus, the Plaintiff lacks expert testimony to explain, for example, how a database works, how a database is "associated" with any given device, or whether two databases are, in fact, required for syncing to occur. Thus, without expert testimony, the Plaintiff cannot met its burden to show that the "database" limitation is met.

Claim 4 requires: "The method of claim 3 further comprising syncing said database associated with said handheld remote terminal with a server." Because this claim depends from Claim 3, and the Plaintiff has not met its burden of proof to show that all of the limitations of Claim 3 are met, the Plaintiff necessarily cannot meet its burden of proof to show that Claim 4 is infringed.

It is not clear whether the remaining Claims depending from Claim 1 are still at issue. In its final infringement contentions, the Plaintiff has also asserted infringement of Dependent

Claim 5, whereas the Defendant, in its final non-infringement contentions includes arguments regarding Dependent Claims 5–12. Neither party argued the merits of these Claims in their briefing. However, each of Dependent Claims 5–12 require the "database" limitation from Claim 3, and therefore, the Plaintiff cannot satisfy its burden of proof to show infringement as to any of these Claims.

Accordingly, the Court will grant summary judgment of non-infringement as to Dependent Claims 2–12.

b.      *System Claims*

The Plaintiff has the burden to prove that when end-users of the AgPhD App use the app for its intended purpose, all of the components of the claimed system are present. One of the limitations in Independent Claim 13 requires that "said unique identifier and said geographic position are stored in a database," where an application is "operable to sync the contents of said database to a lab device." However, the Plaintiff's argument suffers from the same flaws as its argument regarding Dependent Claim 3. As the Court noted above, "database" is not commonly understood by the lay juror, and the Plaintiff has no expert witness or other admissible evidence that this limitation is met. Therefore, the Plaintiff cannot meet its burden of proof to show infringement of Claim 13. Nor, therefore, can the Plaintiff meet its burden of proof as to any of the Claims depending from Claim 13.

c.      *Acts Attributable to Same Entity*

"Where more than one actor is involved in practicing the steps, a court must determine whether the acts of one are attributable to the other such that a single entity is responsible for the

infringement." *Akamai Techs.*, 797 F.3d at 1022; *see also Eli Lilly and Co. v. Teva Parenteral Meds., Inc.*, 845 F.3d 1357, 1364 (Fed. Cir. 2017). An entity is "responsible for others' performance of method steps in two sets of circumstances: (1) where that entity directs or controls others' performance, and (2) where the actors form a joint enterprise." *Akamai Techs.*, 797 F.3d at 1022. Whether a single entity "directed or controlled the acts of one or more third parties is a question of fact" for the jury. *Id.* "[L]iability under § 271(a) can also be found when an alleged infringer conditions participation in an activity or receipt of a benefit upon performance of a step or steps of a patented method and establishes the manner or timing of that performance." *Id.* at 1023.

"Alternatively, where two or more actors form a joint enterprise, all can be charged with the acts of the other, rendering each liable for the steps performed by the other as if each is a single actor." *Id.* To show the existence of a joint enterprise, a party must show "(1) an agreement, express or implied, among the members of the group; (2) a common purpose to be carried out by the group; (3) a community or pecuniary interest in that purpose, among the members; and (4) an equal right to a voice in the direction of the enterprise, which gives an equal right of control." *Id.* Whether a joint enterprise exists is a question of fact for the jury. *Id.*

There is no genuine dispute that the Defendant itself does not perform all of the steps in the claimed method. There is no evidence of record that the Defendant exercises the kind of direction or control over the end-users of the AgPhD App that would establish vicarious liability. Nor is there evidence of record that the Defendant entered into joint enterprises with any end-user of the AgPhD App. Thus, even if some acts of direct infringement occurred, there is no evidence that each of the steps of the method are attributable to the Defendant. The Federal Circuit has held that "a party that sells an apparatus capable of performing a patented method is

generally not liable for direct infringement if that infringing act comes to pass. Instead, the direct infringer would be the party who put that apparatus to use to perform the patented method." *Koninklijke Philips N.V. v. Zoll Med. Corp.*, 656 F. App'x 504, 521 (Fed. Cir. 2016); *see also Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1221 (Fed. Cir. 2014) (finding that the jury did not have substantial evidence to find direct infringement even though it had substantial evidence to find indirect infringement). Accordingly, the Court will grant summary judgment of no direct infringement of the '857 Patent.

However, the Court finds that completion of all the steps involving the AgPhD App can be attributed to the end-user. The end-users first order soil sample containers, which, via the agphdsoiltest.com website, they can buy from Midwest Laboratories. "Contracting" out the generation of the containers does not shield the end-user from liability. *See Marley Mouldings, Ltd. v. Mikron Indus., Inc.*, No. 02 C 2855, 2003 WL 1989640, at *2–3 (N.D. Ill. Apr. 30, 2003) (holding that "[a] party cannot avoid direct infringement merely by having another entity perform one or more of the required steps when that party is connected with the entity performing one or more of the required steps"). The end-users of the AgPhD App contract with one or more entities, such as Midwest Laboratories, to purchase soil sample containers and to test the samples once they have been collected. Therefore, a reasonable trier of fact could conclude that the end-users of the AgPhD App directly infringed the '857 Patent, and, therefore, the Defendant may be liable for indirect infringement.

### 2.      *Indirect Infringement*

Even if the Defendant did not directly infringe the '857 Patent, it may still be liable for indirectly causing third parties to infringe the '857 Patent. Under 35 U.S.C. § 271(b), "[w]hoever

actively induces infringement of a patent shall be liable as an infringer." Under 35 U.S.C.

§ 271(c):

> Whoever offers to sell or sells within the United States . . . a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer.

The Defendant primarily argues that the Plaintiff has no evidence of direct infringement by any person or entity, and, absent direct infringement, there can be no indirect infringement. The Defendant also argues that it is not liable for contributory infringement because the AgPhD App has substantial non-infringing uses and that it is not liable for inducement because it did not have the specific intent to induce infringement.

"Liability for either active inducement of infringement or for contributory infringement is dependent upon the existence of direct infringement." *Joy Techs., Inc. v. Flakt, Inc.*, 6 F.3d 770, 774 (Fed. Cir. 1993). The Defendant points out that the Plaintiff has not come forward with any evidence of specific instances of direct infringement. And, hypotheticals that acts of direct infringement could possibly have occurred are generally not sufficient. *See Dynacore Holdings Corp. v. U.S. Philips Corp.*, 363 F.3d 1263, 1274–76 (Fed. Cir. 2004). However, "[i]t is hornbook law that direct evidence of a fact is not necessary. Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence." *Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings*, 370 F.3d 1354, 1364–65 (Fed. Cir. 2004) (internal quotation omitted) (finding circumstantial evidence sufficient to support jury determination of direct infringement).

In *Koninklijke*, the Federal Circuit overturned a jury verdict of no contributory infringement that was based on a finding that the Plaintiff "failed to prove that any of [the

defendant's] customers actually performed [the] direct infringement." 656 F. App'x at 522. The Federal Circuit reasoned that, due to the defendant's market share, a reasonable juror could not "conclude that not a single one of [the defendant's] customers in this sizable share of the market used the devices for their intended purposes." *Id.* The Federal Circuit has also rejected the argument that a plaintiff "[can]not rely on the instruction sheets to prove acts of direct infringement by end-users" where the "instruction sheets teach an infringing configuration." *Golden Blount, Inc. v. Robert H. Peterson Co.* 438 F.3d 1354, 1362–63 (Fed. Cir. 2006) (affirming finding of induced and contributory infringement); *see also Tinnus Enter.*, 846 F.3d at 1204 ("Indeed, this court has previously approved of the use of instruction manuals to demonstrate direct infringement by customers in the context of induced infringement. . . . We are aware of no case law prohibiting a court from relying on product instructions to find direct infringement"); *Toshiba Corp. v. Imation Corp.*, 681 F.3d 1358, 1365 (Fed. Cir. 2012) ("This is not the first time we have concluded that where an alleged infringer designs a product for use in an infringing way and instructs users to use the product in an infringing way, there is sufficient evidence for a jury to find direct infringement."); *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1318 (Fed. Cir. 2009) (finding sufficient evidence supported the jury's verdict of direct infringement where the defendant "not only designed the accused products to practice the claimed invention, but also instructed its customers to use the accused products in an infringing way.").

A reasonable juror could find that the instructions for the AgPhD App taught an infringing use. Thus, the Court finds that a reasonable juror could not infer that "not a single one" of the end-users of the AgPhD App directly infringed the '857 Patent.

a. Inducement

"Inducement requires a showing that the alleged inducer knew of the patent, knowingly induced the infringing acts, and possessed a specific intent to encourage another's infringement of the patent." *Vita-Mix Corp v. Basic Holding Inc.*, 581 F.3d 1317, 1328 (Fed. Cir. 2009). "Especially where a product has a substantial non-infringing use intent to induce infringement cannot be inferred even when the defendant has actual knowledge that some users of its product may be infringing the patent." *Id.* "The mere knowledge of possible infringement by others does not amount to inducement; specific intent and action to induce infringement must be proven." *Cleveland Clinic Found. v. True Health Diagnostics LLC*, 859 F.3d 1352, 1364 (Fed. Cir. 2017). However, "[e]vidence of active steps taken to encourage direct infringement, such as advertising an infringing use or instructing how to engage in an infringing use, show an affirmative intent that the product be used to infringe." *MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp.*, 420 F.3d 1369, 1379 (Fed. Cir. 2005). But, giving general instructions about how to use a product is insufficient. As the Federal Circuit has stated:

> The question is not just whether instructions "describ[e] the infringing mode," but whether the "instructions teach an infringing use of the device such that we are willing to infer from those instructions an affirmative intent to infringe the patent." Merely "describ[ing]," an infringing mode is not the same as "recommend[ing]," "encourag[ing]," or "promot[ing]," an infringing use, or suggesting that an infringing use "should" be performed.

*Takeda Pharm. U.S.A. Inc. v. West-Ward Pharm. Corp.*, 785 F.3d 625, 631 (Fed. Cir. 2015) (internal citations omitted). But, where the instructions suggest or recommend the infringing use, a jury may properly find the requisite "affirmative intent" to induce infringement. *See, e.g.*, *i4i Ltd. P'ship*, 598 F.3d at 851–52 ("The jury saw and heard about [the defendant's] online training and user support resources, which provided detailed instructions on using [the accused technology].") Not only could a jury find that the instructions taught an infringing use, a jury

could also give weight to the user support services that the Defendant provided to find inducement.

The Defendant admits that it knew about the '857 Patent at least as early as December 2014. It is of no matter whether the Plaintiff was the entity that actually sent the letter that informed the Defendant of the existence of the '857 Patent, nor does it matter that the Plaintiff was not yet the assignee of the '857 Patent at the time the letter was sent. For the purposes of inducement,

> [w]hat matters is not how the putative infringer learned of the patents . . . but simply that the putative infringer has knowledge of the allegedly infringed patent and its claims; it is this knowledge of the patent and its claims by a putative infringer—however obtained—that is essential to a claim for indirect infringement.

*Rembrandt Soc. Media, LP v. Facebook, Inc.*, 950 F. Supp. 2d 876, 882 (E.D. Va. 2013). Thus, if the jury finds that the instructions for the AgPhD App teach an infringing use, the jury could also find that the Defendant knew or should have known that such use would infringe, that the Defendant intended to induce infringement, and that the Defendant therefore indirectly infringed the '857 Patent. Thus, the Court will not grant summary judgment as to the issue of induced infringement.

b.      Contributory Infringement

Under 35 U.S.C. § 271(c), "whoever sells an apparatus for use in practicing a patented method, knowing it to be 'especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial non-infringe use, shall be liable as a contributory infringer.'" *Vita-Mix.*, 581 F.3d at 1327 (quoting 35 U.S.C. § 271(c)). Liability stems from "the core notion that one who sells a component especially designed for use in a patented invention may be liable as a contributory infringer,

provided that the component is not a staple article of commerce suitable for substantial noninfringing use." *Ricoh Co. v. Quanta Computer Inc.*, 550 F.3d 1325, 1337 (Fed. Cir. 2008). "The drafters of [§ 271(c)] explicitly recognized that without protection from contributory infringers, owners of method patents . . . would have no effective protection." *Hodosh v. Block Drug Co.*, 833 F.2d 1575, 1579 (Fed. Cir. 1987).

"Non-infringing uses are substantial when they are not un-usual, far-fetched, illusory, impractical, occasional, aberrant, or experimental." *Vita-Mix*, 581 F.3d at 1327. "In assessing whether a use is substantial, the fact-finder may consider 'the use's frequency . . . the use's practicality, the invention's intended purpose, and the intended market.'" *Toshiba Corp.*, 681 F.3d at 1362 (quoting *i4i Ltd. P'ship*, 598 F.3d at 851)). "Similarly, inefficient and uneconomical uses are less likely to be deemed 'substantial.'" *Hoffmann-La Roche Inc. v. Promega Corp.*, No. C-93-1748, 1994 WL 761241 (N.D. Cal. 1994). "Where the [accused] product is equally capable of, and interchangeably capable of both infringing and substantial non-infringing uses, a claim for contributory infringement does not lie." *In re Bill of Lading Transmission & Processing Sys. Patent Litig.*, 681 F.3d 1323, 1338 (Fed Cir. 2012). "That practicing the patented method may be the most logical or useful purpose for [the accused] products does not render the alternative uses 'unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental.'" *Id.* But, "[i]t does not follow . . . that the inclusion of a component with substantial noninfringing uses in a product that contains *other* components useful only to infringe a process patent can or should defeat liability for contributory infringement under § 271(c)." *Ricoh*, 550 F.3d at 1339–40 (vacating grant of summary judgment of non-infringement where, although the accused product was capable of being used in both an infringing and non-infringing manner, the accused product contained "at least some distinct and separate components used only to perform the allegedly

infringing . . . methods"). In fact, the Federal Circuit has "rejected the argument that an otherwise *infringing* product may automatically escape liability merely because it contains a *noninfringing* staple ingredient." *Id.* at 1339 (citing *Hodosh*, 833 F.2d 1575) (emphasis in original).

The Defendant argues that the AgPhD App has substantial non-infringing uses because the end-user can choose to use the app in the same manner as the Defendant's Soiltest Pro App—a product that the Defendant characterizes as a non-infringing staple—including manually recording identifying information. The Court finds that the AgPhD App could be used in a non-infringing manner by manually recording a unique identifier instead of scanning it. The Court does not find such use to be "unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental" as both the instructions and on-screen prompts within the app give the end-users this option. Therefore, because the AgPhD App has a substantial non-infringing use, the Defendant is not liable for contributory infringement under § 271(c).

## CONCLUSION

For these reasons, the Court GRANTS IN PART and DENIES IN PART the Defendant's Motion for Summary Judgment [ECF No. 131] of non-infringement. The Court grants summary judgment of non-infringement on all claims except Independent Claim 1. The Court also grants summary judgment of no direct infringement of Claim 1 and no contributory infringement of Claim 1. The Court DENIES the Defendant's Motion for Summary Judgment [ECF No. 129] of invalidity, DENIES the Defendant's request to dismiss this case for improper venue and lack of personal jurisdiction, and DENIES the Plaintiff's Motion for Summary Judgment [ECF No. 142] of infringement.

SO ORDERED on January 16, 2018.

_s/ Theresa L. Springmann_
CHIEF JUDGE THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT